# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

In re:

D & L Equipment Inc.,

    Debtor.

_____/

Case No. 10-14965
Hon. Gerald E. Rosen

D & L Equipment Inc.,

    Appellant,

v.

Wells Fargo Equipment Finance, Inc.,

    Appellee.

_____/

Bankr. Case No. 10-72623
Chapter 11
Hon. Walter Shapero

## OPINION AND ORDER AFFIRMING
## BANKRUPTCY COURT'S OPINION REGARDING SUFFICIENCY
## OF COLLATERAL DESCRIPTION IN FINANCING STATEMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on     September 6, 2011

PRESENT: Honorable Gerald E. Rosen
                  Chief Judge, United States District Court

## I. INTRODUCTION

In the present appeal arising from a Chapter 11 bankruptcy proceeding, Debtor/Appellant D & L Equipment Inc. challenges a December 1, 2010 opinion and accompanying December 9, 2010 order in which the Bankruptcy Court ruled that a Uniform Commercial Code ("UCC") financing statement filed by Appellee Wells Fargo

Equipment Finance, Inc. ("Wells Fargo") sufficiently identified Wells Fargo's interest in the portion of Debtor's inventory financed by Wells Fargo after it stepped into the shoes of a prior lender.  Following a hearing on this matter, the Bankruptcy Court permitted the parties to file post-hearing briefs, and then issued a written opinion deciding the issue in favor of Wells Fargo.  Debtor contends that the Bankruptcy Court erred in this ruling, and that the financing statement relied on by Wells Fargo (and the court below) should be deemed effective, at best, to perfect Wells Fargo's security interest in the items financed by the prior lender, but not the items subsequently financed by Wells Fargo.

Having reviewed the parties' written submissions and the pertinent portions of the record on appeal, the Court finds that oral argument would not significantly aid the decisional process, and that it is appropriate to resolve this appeal "on the briefs."  *See* Local Rule 7.1(f)(2), Eastern District of Michigan.  For the reasons set forth below, the Court affirms the Bankruptcy Court's ruling in all respects.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Debtor/Appellant D & L Equipment Inc. ("Debtor") owns a fleet of industrial crushing, screening and conveying equipment, and it sells and leases this equipment for use primarily in road construction and improvement.  On May 4, 2000, Debtor and The CIT Group/Equipment Financing, Inc. ("CIT") entered into a security agreement, under which CIT agreed to provide commercial floor plan financing to Debtor for its use in acquiring stone crushing equipment for its inventory.  To secure repayment, Debtor granted CIT a security interest in the stone crushing equipment acquired through this

financing.

To perfect its security interest, CIT filed a UCC-1 financing statement with the Michigan Secretary of State on September 30, 2005, naming CIT as the secured party and describing the collateral as follows:

> Equipment and inventory financed by The CIT Group/Equipment Financing, Inc., which are held for sale or lease, or which are returned goods, together with all present and future attachments, accessories, substitutions, replacements, accessions and additions thereto, instruments, accounts, rental and contract rights now existing or hereafter arising with respect to the foregoing and all cash and non cash proceeds thereof.

(Appellee's Br., Exhibit 1.)

In 2007, Appellee Wells Fargo Equipment Finance, Inc. ("Wells Fargo") stepped into CIT's shoes as a secured creditor when it purchased CIT's interest in the floor plan financing arrangement with Debtor. On October 17, 2007, Wells Fargo filed a UCC-3 amendment to the above-cited financing statement with the Michigan Secretary of State, identifying itself as the secured party. The collateral description, however, was not amended, but continued to reference equipment and inventory "financed by [CIT]."

In January of 2008, Debtor and Wells Fargo executed certain amendments and supplements to the financing arrangement, through which Wells Fargo agreed to continue to provide Debtor with financing to acquire additional equipment for its inventory. More recently, on April 26, 2010, Wells Fargo filed a UCC-3 continuation statement with the Michigan Secretary of State to prevent its security interest from lapsing. Again, the collateral description in this continuation statement was not amended, and the language at

3

issue has remained unchanged since the original UCC-1 financing statement filed by CIT.

Shortly before Debtor filed for bankruptcy protection on October 25, 2010, it defaulted under the terms of the security agreement by failing to make the required payments. Wells Fargo brought suit in state court to recover possession of the equipment financed under the security agreement, and on October 19, 2010, the state court entered an order granting Wells Fargo possession of the collateral.

After Debtor filed its bankruptcy petition, Wells Fargo filed a motion with the Bankruptcy Court, seeking an order that would either prohibit Debtor from continuing to use the equipment in which Wells Fargo claimed a security interest or, alternatively, require Debtor to make "protection" payments to Wells Fargo as a precondition to the use of this equipment. In response to this motion, Debtor disputed that the security interest claimed by Wells Fargo was properly perfected as to certain items in Debtor's inventory — namely, the equipment that had been financed by Wells Fargo, as opposed to CIT. Upon considering this question, the Bankruptcy Court held that the financing statement and associated UCC filings reflecting the security interests of Wells Fargo and its predecessor, CIT, sufficiently identified the collateral that was subject to these security interests, and thus served to perfect Wells Fargo's interest as to all of the equipment financed by either CIT or Wells Fargo. Debtor now appeals from this ruling.

### III. ANALYSIS

**A.   The Standards Governing This Appeal**

In the present appeal, Debtor challenges the Bankruptcy Court's ruling on a purely legal question — namely, whether Wells Fargo properly perfected its security interest in the items in Debtor's inventory financed by either Wells Fargo or its predecessor, CIT. To the extent that the resolution of this issue turns upon facts, the pertinent facts are not in dispute. Accordingly, because this appeal implicates only questions of law, this Court reviews *de novo* the Bankruptcy Court's resolution of these legal issues. *See First National Bank of Barnesville v. Rafoth (In re Baker & Getty Financial Services, Inc.)*, 974 F.2d 712, 717 (6th Cir. 1992).

**B.     The UCC Filings Made by Wells Fargo and Its Predecessor, CIT, Were Sufficient to Provide Notice of Wells Fargo's Security Interest, and Any Errors or Omissions Did Not Render These Filings Seriously Misleading.**

**1.     The Contents of a Valid UCC Financing Statement**

Because this appeal turns upon the adequacy of the UCC filings made by Wells Fargo and its predecessor, CIT, the Court begins with a brief survey of the UCC provisions that define the contents of a valid UCC financing statement. First, § 9-502 of the UCC provides that "a financing statement is sufficient only if it does all of the following: (a) [p]rovides the name of the debtor[;] (b) [p]rovides the name of the secured party or a representative of the secured party[; and] (c) [i]ndicates the collateral covered by the financing statement." Mich. Comp. Laws § 440.9502(1). Next, § 9-504 states that "[a] financing statement sufficiently indicates the collateral that it covers" if it provides "[a] description of the collateral pursuant to section 9[-]108." Mich. Comp. Laws § 440.9504. This latter UCC provision, in turn, states that "a description of personal or real

5

property is sufficient, whether or not it is specific, if it reasonably identifies what is described," Mich. Comp. Laws § 440.9108(1), and collateral is deemed to be "reasonably identifie[d]" if it is described by reference to "a type of collateral defined in the uniform commercial code," Mich. Comp. Laws § 440.9108(2)(c).[1]

Beyond these specific requirements, it is clear from the pertinent UCC provisions and their accompanying commentary that the UCC has "adopt[ed] the system of 'notice filing.'" Mich. Comp. Laws § 440.9502 cmt. 2. Thus, it is sufficient that a financing statement "indicates merely that a person may have a security interest in the collateral indicated," and "[f]urther inquiry from the parties concerned will be necessary to disclose the complete state of affairs." Mich. Comp. Laws § 440.9502 cmt. 2. The commentary to UCC § 9-502 further states:

> Notice filing has proved to be of great use in financing transactions involving inventory, accounts, and chattel paper, because it obviates the necessity of refiling on each of a series of transactions in a continuing arrangement under which the collateral changes from day to day. However, even in the case of filings that do not necessarily involve a series of transactions (e.g., a loan secured by a single item of equipment), a financing statement is effective to encompass transactions under a security agreement not in existence and not contemplated at the time the notice was filed, if the indication of collateral in the financing statement is sufficient to cover the collateral concerned. Similarly, a financing statement is effective to cover after-acquired property of the type indicated and to perfect with respect to future advances under security agreements, regardless of whether after-acquired property or future advances are mentioned in the financing

---

[1] The terms used in the financing statement at issue here to describe the collateral — *i.e.,* "[e]quipment" and "inventory" — qualify as "type[s] of collateral defined in" the UCC. *See* Mich. Comp. Laws § 440.9102(1)(gg) (defining "[e]quipment"); Mich. Comp. Laws § 440.9102(1)(vv) (defining "[i]nventory").

> statement and even if not in the contemplation of the parties at the time the financing statement was authorized to be filed.

Mich. Comp. Laws § 440.9502 cmt. 2. Finally, and more generally, § 1-102 of the UCC provides that the "act shall be liberally construed and applied to promote its underlying purposes and policies," Mich. Comp. Laws § 440.1102(1), and one of the "[u]nderlying purposes and policies" identified in § 1-102 is to "simplify, clarify and modernize the law governing commercial transactions," Mich. Comp. Laws § 440.1102(2)(a).

### 2. The Filings in This Case Satisfied the UCC Standard of "Notice Filing" by Alerting Third Parties to the Need for Further Inquiry as to Which Items of Equipment and Inventory Were Subject to Wells Fargo's Security Interest.

Returning to the particular UCC filings at issue here, all are agreed that the UCC-3 amendment filed by Wells Fargo after it purchased CIT's interest in the floor plan financing arrangement with Debtor sufficed to identify Wells Fargo as the secured party of record in place of CIT. *See* Mich. Comp. Laws § 440.9512(2) ("If an amendment of a financing statement that provides the name of a person as a secured party or a representative of a secured party is filed, the person named in the amendment is a secured party of record."). The sole point of dispute here, then, is whether the collateral description contained in CIT's initial UCC-1 financing statement — a description that was never changed in Wells Fargo's subsequent UCC filings — operated to notify others that Wells Fargo's acknowledged security interest was limited only to equipment and inventory that had been "financed by [CIT]," or whether this description instead provided

sufficient notice that Wells Fargo's security interest extended to the additional equipment and inventory that was financed by Wells Fargo after it stepped into CIT's shoes.

The parties have not identified any court rulings that address precisely these circumstances, but instead seek to appeal by analogy to cases that arose from somewhat different facts. First, Wells Fargo points to — and the Bankruptcy Court likewise relied upon — the decision in *Allis-Chalmers Credit Corp. v. Tri-State Equipment, Inc. (In re Tri-State Equipment, Inc.),* 792 F.2d 967, 969, 972 (10th Cir. 1986), in which the Tenth Circuit held that an admittedly "poorly drafted" financing statement was nonetheless sufficient to put others on notice of a possible security interest that warranted further inquiry. The financing statement at issue encompassed both the debtor's inventory of new and used equipment and the "proceeds therefrom," but these references to "new and used equipment" and "proceeds" were followed by the language "manufactured by or offered for sale by [plaintiff] Allis-Chalmers Corporation." *Tri-State Equipment,* 792 F.2d at 969. Thus, while it was clear that the financing statement disclosed creditor Allis-Chalmers' security interest in debtor Tri-State's inventory of new and used equipment manufactured or sold by Allis-Chalmers, it was less clear whether the statement sufficiently disclosed Allis-Chalmers' interest in a particular type of "proceeds" obtained by Tri-State through its sales of equipment from its inventory — namely, equipment that Tri-State had accepted as trade-ins during the course of these sales, but that was ***not*** manufactured by Allis-Chalmers. The "key question" before the court, then, was "what was modified by the phrase 'manufactured by or offered for sale by Allis-Chalmers'" —

8

*i.e.,* whether this phrase applied only to the "inventory" portion of the collateral description, or to the "proceeds" portion of this description as well. 792 F.2d at 970.

Upon considering this issue, the court acknowledged that the language of the financing statement remained ambiguous under any reading, so that it was necessary to determine the effect of a financing statement when its language "has several [possible] meanings." 792 F.2d at 971. At the threshold of this inquiry, the court observed that the UCC has adopted a "simple system of notice filing," under which "a proper financing statement will show merely that the secured party who has filed *may* have a security interest in the collateral described." 792 F.2d at 971 (internal quotation marks and citations omitted) (emphasis in original). This system, the court explained, places a burden on "later creditors to protect themselves by getting full information on any prior agreements flagged by the minimal financing statement filing." 792 F.2d at 971.

The court then surveyed the case law of the forum state (Colorado) and other jurisdictions to ascertain how these general principles of notice filing had been applied to vague or ambiguous financing statements:

> . . . [T]he settled rule in Colorado is that the description in the filing need only put other *creditors on notice of a possible security interest in the collateral* in question. Most other courts are also now willing to find a description that is unclear or susceptible to more than one distinct meaning sufficient in circumstances in which the description would put other creditors on notice of the need for further inquiry.

792 F.2d at 971 (internal quotation marks and citations omitted) (emphasis in original).

Applying these standards, the court held that the collateral description in the Allis-Chalmers financing statement, while ambiguous, was "sufficient to put [other creditors] on notice of a possible Allis-Chalmers security interest in the contested Tri-State trade-ins," including trade-in equipment collected as "proceeds" but not manufactured by Allis-Chalmers. 792 F.2d at 972; *see also International Harvester Credit Corp. v. Nicholls (In re Richards),* 455 F.2d 281, 284 (6th Cir. 1972) (holding that a financing statement that described collateral by initials and serial numbers, without indicating what the initials stood for, was sufficient to "put any interested person on inquiry that [creditor] International Harvester Co. had a security interest in the property described"); *First Bank v. Eastern Livestock Co.,* 837 F. Supp. 792, 801 (S.D. Miss. 1993) ("[A] financing statement, though ambiguous, may nevertheless provide adequate notice to a prospective purchaser or lender that such party should make further inquiry to ascertain the extent of the collateral covered by a secured party's agreement with the debtor.").

    Next, Wells Fargo directs the Court's attention to cases in which the courts placed importance upon a financing statement's reference to types of collateral that are expressly defined in the UCC itself. As noted earlier, UCC § 9-108 provides that a collateral description "reasonably identifies the collateral" if it references "a type of collateral defined in the uniform commercial code," Mich. Comp. Laws § 440.9108(2)(c), and the terms "[e]quipment" and "inventory" used in the financing statement at issue here are, in fact, defined elsewhere in the UCC, *see* Mich. Comp. Laws §§ 440.9102(1)(gg), 440.9102(1)(vv). In reliance on this UCC provision, the court in *Canfield v. Small*

*Business Administration (In re Tebbs Construction Co.),* 39 B.R. 742, 745-47 (Bankr. E.D. Va. 1984), held that a financing statement that described the collateral as "items of machinery and equipment . . . as set forth in the attached security agreement" was sufficient to put third parties on notice of a possible security interest, even though no security agreement had been attached to the financing statement. In support of this holding, the court reasoned that "the failure to further describe collateral where a description as to type alone would be sufficient does not cause the financing statement to be invalid." *Tebbs Construction,* 39 B.R. at 747; *see also In re Stegman,* 1974 WL 21717, 15 U.C.C. Rep. Serv. 225 (S.D. Fla. July 23, 1974) (holding that a financing statement's reference to "various equipment, see Schedule 'A' attached hereto," was sufficient despite the failure to attach the schedule, where the reference alone "should have put a reasonable searcher on notice that the desired information could be obtained by inquiry of the creditor or the debtor"); *cf. I.A. Durbin, Inc. v. Jefferson National Bank (In re I.A. Durbin, Inc.),* 46 B.R. 595, 600 (Bankr. S.D. Fla. 1985) ("Where a secured creditor elects to describe specific property rather than 'types,' *i.e.,* inventory, accounts receivable, equipment, general intangibles, etc., the creditor is perfected only to the property so described and not to other property of the same type.").

      These decisions — and, of course, the UCC provisions upon which they rely — provide ample support for the Bankruptcy Court's ruling in this case. As this body of law makes clear, it is enough that CIT's and Wells Fargo's UCC filings put interested parties on notice of a possible security interest in Debtor's equipment and inventory, such that

11

they would perceive the need to inquire further into the precise nature and extent of this security interest.  Plainly, CIT's initial filing disclosed that some of this equipment and inventory — namely, the portion financed by CIT — was subject to a security interest.  Moreover, Wells Fargo's subsequent filings disclosed that it had stepped into the shoes of CIT as the secured party.  Given the nature of the security interest — an interest that categorized Debtor's equipment and inventory depending on whether it had been acquired through financing — any interested party naturally would have to make an inquiry to determine which items of equipment and inventory were subject to this interest, because the relevant characteristic of any given item — financed or not — would not be revealed through simple inspection.

As the Bankruptcy Court observed, (*see* Bankr. Ct. 12/1/2010 Op. at 4), any such inquiry surely would have divulged that Wells Fargo, upon stepping into CIT's shoes, had continued to operate under the floor plan financing arrangement established by its predecessor CIT.  Under this arrangement, Wells Fargo continued to advance funds used by Debtor to acquire additional inventory.  This discovery, in turn, would certainly have suggested the possibility, at least, that Wells Fargo's security interest extended not only to the inventory financed by CIT, but also to the items of inventory financed by Wells Fargo after it assumed CIT's role as secured party, and further inquiry into this possibility would have revealed that Wells Fargo did, in fact, hold a security interest in all of the

inventory financed by itself or its predecessor, CIT.[2] Indeed, it seems clear that any interested parties did, in fact, receive adequate notice from CIT's and Wells Fargo's UCC filings, and that they undertook the necessary inquiry triggered by this notice — as Wells Fargo states without contradiction, "there was never any misunderstanding among Debtor's many secured creditors as to which items of Debtor's inventory were covered by" the UCC filings. (Appellee Br. at 6.) Finally, and as confirmed by the above-cited case law, because CIT's initial UCC filing referenced types of collateral expressly defined in the UCC itself — namely, equipment and inventory — this filing "reasonably identifie[d] the collateral," Mich. Comp. Laws § 440.9108(2)(c), and a failure to further specify the particular items of equipment and inventory subject to this security interest did not serve to invalidate CIT's and Wells Fargo's UCC filings.

The cases cited by Debtor are not to the contrary. First, Debtor notes the recognition in the case law that "[t]he presence of qualifying language in a financing statement functions to limit the scope of perfection of the secured creditor's security interest." *In re Holladay House, Inc.,* 387 B.R. 689, 695 (Bankr. E.D. Va. 2008). Yet, the "qualifying language" here — "financed by CIT" — is readily distinguishable from the limiting language in the decisions cited by Debtor. In *Mason v. Heller Financial Leasing, Inc. (In re JII Liquidating, Inc.),* 341 B.R. 256, 274-275 (Bankr. N.D. Ill. 2006), for example, the court held that a security interest was perfected only as to the sixteen

---

[2]Debtor does not challenge the validity of Wells Fargo's underlying security interest, but only the sufficiency of the UCC filings to provide notice of this interest.

pieces of equipment specifically identified in a financing statement, and not the "hundreds" of other items of equipment not listed in this filing. Similarly, in *CLC Equipment Co. v. Brewer (In re Value-Added Communications, Inc.),* 139 F.3d 543, 545 (5th Cir. 1998), the financing statements at issue referenced "equipment and personal property covered by" a specified equipment lease, and the court held that "[t]he express language of the financing statements covers no more than the items" listed in this lease. *See also I.A. Durbin,* 46 B.R. at 600-01 (addressing a financing statement that "limit[ed] its description to intangible property rights encumbered by a mortgage on seven specifically described parcels of property," and concluding that a third party reviewing this financing statement "could justifiably interpret it as evidencing an existing security agreement only in those assets specifically described in the real property mortgage"); *In re Aragon Industries, Inc.,* 1973 WL 21377, 14 U.C.C. Rep. Serv. 1218 (S.D. Fla. Nov. 21, 1973) (holding that a financing statement identifying four forklifts by their serial numbers did not cover two forklifts with "serial numbers in no way related to those" listed in the financing statement, where "the serial number was the *only* way to identify" the forklifts subject to a security interest).

In each of these cases, the limiting language in a financing statement not only specified the particular items that were subject to a security interest, but also obviated the need for further inquiry. This language, by its very nature, permitted an interested party to conclusively determine whether a given item fell within or outside the specified class — *e.g.,* whether the item was among the listed pieces of equipment, *JII Liquidating,* 341

B.R. at 274-275, or had one of the specified serial numbers, *Aragon Industries,* 1973 WL 21377. Here, by contrast, the language at issue, "financed by CIT," did not describe a self-evident characteristic that encompassed or excluded the various items in Debtor's inventory, but instead invited additional inquiry to determine which items in this inventory Debtor had obtained through its floor plan financing. As explained earlier, this inquiry would have revealed that some items in Debtor's inventory had been obtained through financing provided by CIT's properly identified successor-in-interest, Wells Fargo. This, in turn, would have given rise to the obvious question whether these items financed by Wells Fargo *also* were subject to a security interest, and further inquiry would have answered this question in the affirmative. Because the language here necessitated an inquiry that would have disclosed Wells Fargo's security interest, rather than foreclosing the need for an inquiry or channeling an interested party's attention away from asking the questions that would reveal this interest, the Court finds that the bulk of the cases cited by Debtor are readily distinguishable.

    One of the cases identified by Debtor, however, lends somewhat more support to its position. In *Holladay House,* 387 B.R. at 693, the financing statement at issue described the collateral by reference to an "Attached List," and this list, in turn, provided that the creditor's security interest encompassed "[a]ll inventory, furniture and furnishings of every kind . . . *delivered to consignee at any time by consignor pursuant to a consignment agreement.*" (Emphasis in original.) The court found that this language limited the creditor's "perfected security interest to the inventory that it delivered to the

15

Debtor," but did not perfect the creditor's "security interest in all of the other inventory owned by the Debtor." *Holladay House,* 387 B.R. at 695-96. Although the underlying security agreement granted the creditor a somewhat broader security interest encompassing more items in the debtor's inventory, the financing statement made no reference to this underlying agreement, and the court opined that "[t]he mere existence of a financing statement does not trigger a duty for third parties to inquire into the terms of the underlying security agreement." 387 B.R. at 696. Rather, absent incorporation of or reference to an underlying security agreement, the court opined that "a reasonable title searcher is under no duty or obligation to do anything but rely upon the indication of collateral in the financing statement." 387 B.R. at 696.

In *Holladay House,* as here, a broader reference to "inventory" was limited by language specifying the *means* by which the inventory came into the debtor's possession. Here, the means in question is "financ[ing] by CIT," while the financing statement in *Holladay House* referenced delivery to the debtor pursuant to a consignment arrangement between the parties. In Debtor's view, then, just as the creditor's perfected security interest in *Holladay House* was limited to inventory delivered through this consignment arrangement, Wells Fargo's perfected security interest in this case should be limited to inventory "financed by CIT."

While this argument has some merit, the Court finds that it ultimately fails to carry the day. Nothing in the financing statement in *Holladay House* suggested the possibility that the creditor had a security interest in any inventory beyond that delivered to the

16

debtor pursuant to the parties' consignment agreement.  Here, in contrast, while CIT's initial UCC filing, viewed in isolation, would limit this creditor's perfected security interest to those items in Debtor's inventory that it had financed, this initial UCC filing must be viewed in the context of subsequent filings in which Wells Fargo gave notice that it had stepped into the shoes of CIT.  As the Bankruptcy Court observed, the "cumulative effect" of CIT's and Wells Fargo's UCC filings was to notify third parties — or, at a minimum, alert them to the possibility — that Wells Fargo had assumed CIT's role in the floor plan financing arrangement through which Debtor acquired additional inventory.  (Bankr. Ct. 12/1/2010 Op. at 4.)  Unlike in *Holladay House,* then, the ***arrangement*** through which items in Debtor's inventory became subject to a security interest — *i.e.,* acquisition through floor plan financing — remained the same before and after the transition from CIT to Wells Fargo as secured creditor, with only the identity of this secured creditor having changed.  As Wells Fargo concedes, it cannot claim a perfected security interest in any items that were added to Debtor's inventory through arrangements or means other than the floor plan financing scheme initiated by CIT and assumed by Wells Fargo.  Yet, because CIT's and Wells Fargo's UCC filings, viewed collectively, would give notice to third parties that inventory obtained by Debtor through a CIT/Wells Fargo floor plan financing arrangement was — or at least might be — subject to a security interest, the Court finds that these filings do not suffer from the deficiency identified in *Holladay House.*

       Finally, while Wells Fargo admittedly could have avoided any possible confusion

by amending the collateral description to encompass items financed by *either* CIT or Wells Fargo, the Bankruptcy Court correctly observed that any such error or omission did not automatically render Wells Fargo's filings deficient under the UCC system of notice filing. Rather, under UCC § 9-506(1), "[a] financing statement substantially satisfying the requirements of [Article 9] is effective, even if it has minor errors or omissions, unless the errors or omissions make the financing statement seriously misleading." Mich. Comp. Laws § 440.9506(1).

Here, as in *Tri-State Equipment,* 792 F.2d at 972, although Wells Fargo could have more clearly described the extent of its security interest, its failure to do so was not "seriously misleading," as its UCC filings would not have "stop[ped] future creditors from making the further inquiries they were obligated by the U.C.C. to make." Instead, and as discussed earlier, CIT's initial UCC filing accurately disclosed the mechanism — *i.e.,* a financing arrangement — through which a security interest would arise, and this disclosure, by its very nature, necessitated an inquiry to identify which items in Debtor's inventory had been acquired through this arrangement. Moreover, Wells Fargo's subsequent filings accurately identified this creditor as CIT's successor, thereby alerting third parties to the need to include Wells Fargo in any inquiry. Finally, and as noted earlier, Wells Fargo points to the brute fact that, so far as the record discloses, Debtor's other secured creditors evidenced no confusion or misunderstanding as to which items of Debtor's inventory were covered by CIT's and Wells Fargo's UCC filings. This record provides ample support for the Bankruptcy Court's conclusion that the defects in Wells

Fargo's filings did not render them "seriously misleading."

## IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that the Bankruptcy Court's December 1, 2010 opinion and accompanying December 9, 2010 order are AFFIRMED in all respects.

                                                s/Gerald E. Rosen
                                                Chief Judge, United States District Court

Dated: September 6, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 6, 2011, by electronic and/or ordinary mail.

                                                s/Ruth A. Gunther
                                                Case Manager